**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANDRE GREEN, | |
| Plaintiff, | No. 19-cv-02871 |
| | Judge Franklin U. Valderrama |
| v. | |
| SUTTON FORD, INC., | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Andre Green (Green) worked as a car sales consultant at Defendant Sutton Ford, Inc. (Sutton Ford) until he quit due to a medical condition. Green filed this suit after Sutton Ford refused to rehire him, asserting claims of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count I); retaliation in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* (Count II); and promissory estoppel under state law (Count III). Sutton Ford moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(a). R. 53, Mot. Summ. J. For the following reasons, Sutton Ford's motion is granted as to Green's FMLA claim and denied as to his ADA and promissory estoppel claims.

**Background**[1]

## I.     Local Rule 56.1 Statements and Responses

When "a party moves for summary judgment in the Northern District of Illinois, it must submit a memorandum of law, a short statement of undisputed material facts [(L.R. 56.1 Statement)], and copies of documents (and other materials) that demonstrate the existence of those facts." *ABC Acquisition Co., LLC v. AIP Prod. Corp.*, 2020 WL 4607247, at *7 (N.D. Ill. Aug. 11, 2020) (citing N.D. Ill. Local R. 56.1(a)). The Local Rule 56.1 statement must cite to specific pages or paragraphs of the documents and materials in the record. *Id.* (citing *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004)). As Green points out in his response, the evidence cited by Sutton Ford in parts of its Statement of Facts does not support Sutton Ford's specific assertions. *See, e.g.*, R. 60 at 1–21, Pl.'s Resp. DSOF ¶ 5 (Sutton Ford asserts that Green developed glaucoma and neuropathy, but the cited deposition testimony only mentions leg weakness). As a result, the Court accepts as true the facts set forth in Sutton Ford's Local Rule 56.1 statement only "to the extent th[ose] facts [a]re supported by admissible and docketed evidence." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 411 (7th Cir. 2019) (internal quotation marks omitted). Of course, the Court also considers Green's statements of additional material facts to

---

[1]This factual background is taken from the parties' Rule 56.1 statements of facts and responses, including Defendant's Statement of Facts (R. 55, DSOF), Plaintiff's Response to Defendant's Statement of Facts (R. 60 at 1–21, Pl.'s Resp. DSOF), Plaintiff's Statement of Additional Facts (R. 60 at 21–28, PSOAF), and Defendant's Response to Plaintiff's Statement of Additional Facts (R. 61, Def.'s Resp. PSOAF).

the extent that they is supported by record evidence before the Court. N.D. Ill. Local R. 56.1(b)(3).

## II.    Material Facts

The following undisputed facts are set forth as favorably to Green, the non-movant, as the record and Local Rule 56.1 permit. *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). On summary judgment, the Court assumes the truth of those facts, but does not vouch for them. *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 281 (7th Cir. 2015).

### A.    Green's Initial Position and Transition to Flex Time Work

Sutton Ford, a car dealership located in Matteson, Illinois, hired Green in July 2007 as a sales consultant.[2] Pl.'s Resp. DSOF ¶ 1. At first, Green worked full-time, forty-eight hours per week and was required to traverse the dealership's sales lot and stand for extended periods of time. *Id.* ¶ 3. He earned a salary, thirty-percent commissions from his sales, and monthly bonuses and used a company car (a "demonstrator"). *Id.* ¶ 4. At some point leading up to 2015, Green developed issues with his kidneys. *See* R. 61, Def.'s Resp. PSOAF ¶ 4. In 2016, Green began undergoing 10-hour dialysis sessions at night, which continued through 2018 and part of 2019. Pl.'s Resp. DSOF ¶ 6.

Because of these issues with his health, Green requested FMLA leave sometime in 2015. Pl.'s Resp. DSOF ¶ 7; *see* Def.'s Resp. PSOAF ¶ 4. Nathaniel Sutton (Sutton), the owner of Sutton Ford, told Green that FMLA leave would be without

---

[2]Sutton Ford calls the position "a New Vehicle Sales Person." R. 54, Memo. at 2.

pay, and that Green did not need FLMA leave. Pl.'s Resp. DSOF ¶ 7; Def.'s Resp. PSOAF ¶ 34. Sutton instead offered to give Green special hours and accommodations so Green could continue working full time and use his company car. Pl.'s Resp. DSOF ¶¶ 7–8. These accommodations allowed Green to work 7 to 8 hours per day while choosing his own hours and making his own schedule. Pl.'s Resp. DSOF ¶ 8; Def.'s Resp. PSOAF ¶¶ 13–15. Without the accommodations, it would have been difficult for Green to work long hours and still do his dialysis. Pl.'s Resp. DSOF ¶ 8.

While other Sutton Ford employees had requested and taken FMLA leave, Green was the only employee given flex-time accommodations, and at the time, there were no part-time[3] sales employees. Pl.'s Resp. DSOF ¶ 7. Green testified that he ultimately forgot about his request for FMLA leave, but never withdrew his request. Def.'s Resp. PSOAF ¶ 34. While Green contends that Sutton informed him that the change to a flexible schedule would be a permanent one in terms of the conditions of his job position, rather than a temporary accommodation, Sutton Ford disputes that Sutton made that statement. Pl.'s Resp. DSOF ¶ 7; Def.'s Resp. PSOAF ¶ 4.

## B.    Short Term Disability and SSDI

During 2017, Green was diagnosed with diabetic neuropathy, began using a cane to walk due to weakness in his legs, and a doctor noted that he had to stop working as a car salesman due to being on his feet for too long. Pl.'s Resp. DSOF ¶¶ 10–13. In November 2017, Green requested and took short-term disability (STD),

---

[3]Sutton Ford seems to maintain that Green's position was full-time until he took time off for short term disability in November 2017, but in its response to Green's Statement of Additional Facts, Sutton Ford "admits Plaintiff was allowed to work part-time between 2015 and 2017." Def.'s Resp. PSOAF ¶ 28.

though he retained use of his demonstrator vehicle. *Id.* ¶ 14. Green began receiving STD benefit payments in December 2017 and continued receiving them until at least May 29, 2018. *Id.* ¶¶ 14, 28, 30.

In December 2017, after taking short term disability leave, Green applied for social security disability (SSDI) benefits based on his kidney failure. He identified his need to walk at work as a primary reason for being unable to continue working. Pl.'s Resp. DSOF ¶ 16. On December 27, 2017, the Social Security Administration (SSA) deemed him disabled as of November 28, 2017 and he began receiving monthly benefits in May 2018. *Id.* ¶¶ 17, 32. Green testified that he remained disabled through September 2018. *Id.* ¶ 36.

Medical evidence from December 2017 through May 2018 shows that Green continued to have health issues. On December 28, 2017, Green saw his primary care physician, Dr. Dwayne Buchanan (Dr. Buchanan). Pl.'s Resp. DSOF ¶ 18. At the initial visit, Dr. Buchanan noted that Green had lower back pain and weakness in his legs, was seeing a neurologist, and was at a high risk for falls. *Id.* ¶ 18. Green began physical therapy in January 2018. *Id.* ¶ 20. The therapist noted that Green had significant weakness affecting his gait, safety, and activities of daily living. *Id.* Green indicated he had difficulty with stairs and long-distance walking, and reported hip weakness and that he used his arms to lift his legs in and out of the car and bed. *Id.* ¶¶ 20–21. In April 2018, Green reported falling while using a cane outside his dialysis clinic. *Id.* ¶ 24. Green was discharged from physical therapy on May 23, 2018 with no real subjective or objective change in his presentation. *Id.* ¶ 29.

### C. Resignation

On May 15, 2018, Green, via his wife, asked Sutton Ford how to withdraw funds from his 401(k). Pl.'s Resp. DSOF ¶ 29. Sutton Ford advised Green that he could not take a distribution unless he terminated his employment, because he had not reached retirement age and there was an outstanding loan against his account. *Id.* Green therefore resigned from Sutton Ford on May 29, 2018. *Id.* ¶¶ 30–31. It is undisputed that when Green resigned from Sutton Ford in order to receive his 401(k) distribution, Sutton told him, "you'll always have a job here when your doctor clears you." Def.'s Resp. PSOAF ¶ 27. According to Green, he resigned in reliance on Sutton's promise that Sutton Ford would hire him back when his doctor cleared him, and he would not have resigned without Sutton's promise. Pl.'s Resp. DSOF ¶ 30.

### D. Clearance for Part-Time Work

After undergoing physical therapy in May 2018 at Ingalls Memorial Hospital, Green switched over to physical therapy two times per week at Olympia Fields. Def.'s Resp. PSOAF ¶ 8. Green maintains that by June 2018, his condition had improved as a result of his physical therapy at Olympia Fields. *Id.* ¶ 35. On July 13, 2018, Green saw Dr. Buchanan for his 3-month follow up. Pl.'s Resp. DSOF ¶ 34. Medical notes from that appointment indicate that Green had some improvement in his pain level. *Id.* ¶ 34 (citing R. 54-3 at 477). While Dr. Buchanan found Green's condition "[u]nchanged," he released Green, "back to work for light duty trial." *Id.* (citing R. 54-3 at 480). Finally, the medical note states, "Note for work: ok to return to work part time light duty on 8/13/2018." *Id.* (citing R. 54-3 at 482).

6

Green asserts that he was given (and ultimately gave to Sutton) an original work note from July 13, 2018 that Dr. Buchanan signed that said Green could return to part-time light duty work on August 13, 2018. Pl.'s Resp. DSOF ¶¶ 35, 41; Def.'s Resp. PSOAF ¶ 39. Dr. Buchanan also testified that he cleared Green for part-time work. Def.'s Resp. PSOAF ¶ 9. However, no copy of a work note was in Dr. Buchanan's records, and none of Dr. Buchanan's records for office visits after July 13, 2018 reflect any discussion between Dr. Buchanan and Green regarding the proposed work trial. Pl.'s Resp. DSOF ¶ 35. Green insists that Dr. Buchanan cleared him to work the same hours he had worked before he took short term disability, but Sutton Ford disputes this, because Dr. Buchanan testified that he did not recall making that statement or speaking to Green about Green's specific job duties. *Id.* ¶¶ 9–11.

## E. Refusal to Rehire

In August 2018, Green contacted Sutton to discuss returning to Sutton Ford. Pl.'s Resp. DSOF ¶ 37. Sutton told Green to bring a doctor's note claiming he was capable of working, and they could talk about it. *Id.* Green says he expected "the flex hours that I had before I went—before I left work, meaning took the time off." *Id.* (citing R. 54-1, Green Dep. 14–16). Sutton and Green met on September 25, 2018 to discuss the prospect of Green returning to Sutton Ford. *Id.* ¶ 39. Sutton claims that Green appeared sick at the meeting, as though he had lost 30 to 40 pounds, and Sutton was aware of how Green's medical condition had previously impacted his ability to work at Sutton Ford and how he still had not had a kidney or pancreas transplant. *Id.* ¶ 40. Green insists that he brought Dr. Buchanan's July 13, 2018 note

7

to the September 25 meeting, which Sutton read but refused to touch or pick up. *Id.* ¶ 41. Sutton denies that Green ever brought the doctor note. *Id.* Dr. Buchanan's July 13, 2018 note that Green allegedly provided to Sutton states, "The patient may return to work part time light duty on August 13, 2018." Pl.'s Resp. DSOF ¶ 42 (citing Green Dep. at 112). On October 12, 2018, Dr. Buchanan noted that Green was "doing physical therapy and walking a lot better now." Def.'s Resp. PSOAF ¶ 1.

Green contends that Sutton told him at the September 25 meeting that he could not return to work without Sutton talking to his insurance company, and that Sutton said he "just can't chance [Green] being here any longer without you having your kidney transplant." Def.'s Resp. PSOAF ¶ 3 (citing Green Dep. 68:11–13). Sutton Ford denies those allegations, while citing to Sutton's testimony that he told Green he could not give Green a car out of concern that Green could "kill somebody and the company gets sued[.]" *Id.* (citing R. 54-2, Sutton Dep. 38:1–14 ("I said well, Andre, you're not capable, and you don't have a doctor's release.")); *see* R. 54, Memo. at 10 (Sutton Ford states that Sutton did not hire Green "[b]ased on [Sutton's] personal knowledge of Green's medical history (including the fact that Green had not yet received a kidney transplant), Green's [sickly] presentation at the meeting . . . and lack of the requested medical documentation clearing Green for full-time duty[.]").

At the September 25, 2018 meeting, Sutton did not offer Green a position. Pl.'s Resp. DSOF ¶ 43. Approximately one month later, Green sent a demand letter to Sutton Ford. *Id.* ¶ 44. Sutton Ford responded with a letter dated October 31, 2018, describing that Green had been accommodated with part-time work from 2015 to

2017, while still receiving full salary, and had not submitted a doctor's release for full-time or part-time employment. *Id.* ¶ 45 (citing Green Dep. at 113–14). The October 31 letter further explained that Sutton Ford was still offering Green a part-time position calling customers for $10.00 per hour and 50% commission, because Green could not walk the lot and perform all sales responsibilities. *Id.* Green rejected the offer of part-time employment, as it would change his previous compensation structure. *Id.* ¶ 46. Green subsequently filed a charge with the EEOC alleging discrimination under the ADA and retaliation under the FMLA. *Id.* ¶ 47.

Green received a kidney and pancreas transplant in March 2019, and in December 2019, for the first time, a transplant doctor released him to return to full-time work. Pl.'s Resp. DSOF ¶ 48.

Green subsequently filed a three-count complaint against Sutton Ford asserting claims of discrimination under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq* (Count I); retaliation under Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq* (Count II); and promissory estoppel under state law (Count III). Sutton Ford's motion for summary judgment is before the Court.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460

9

(7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence," Fed. R. Civ. P. 56(c)(2).

## Analysis

### I.   ADA Claim

In Count I, Green alleges that Sutton Ford failed to hire him in September 2018 because it improperly regarded him as disabled, thus discriminating against him in violation of the ADA. R. 3, Complaint ¶ 26.

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability[.]" *Steffen v. Donahoe*, 680 F.3d 738, 743 (7th Cir. 2012) (quoting 42 U.S.C. § 12112(a)). Under the ADA, "disability" means, in part, "being regarded as" having "a physical or mental impairment that substantially limits one or more major life activities[.]" 42 U.S.C. § 12102. The "regarded as" clause "was designed to protect people who are not actually disabled but who might suffer

from stereotypes and prejudices harbored by ignorant employers." *DiGiosia v. Aurora Health Care, Inc.*, 48 F. Supp. 3d 1211, 1215 (E.D. Wis. 2014); *Harrington v. Rice Lake Weighing Sys., Inc.,* 122 F.3d 456, 459 (7th Cir. 1997) (section was designed to "combat erroneous stereotypes that employers may have about impairments that are not, in themselves, substantially limiting"); *see Equal Emp. Opportunity Comm'n v. Amsted Rail Co.*, 280 F. Supp. 3d 1141, 1150–51 (S.D. Ill. 2017) ("[I]t is enough under the 'regarded as' prong to show that an employer failed to hire an applicant because it believed, rightly or wrongly, that he would be a safety risk. . . . Whether the applicant was actually a safety risk is a separate inquiry to be determined in the context of the qualification inquiry or the direct threat defense.").

To prevail on his ADA discrimination claim, Green bears the burden of showing that (1) he was disabled within the meaning of the ADA[4]; (2) he was qualified to perform the essential functions of the job either with or without a reasonable accommodation; and (3) he suffered an adverse employment action on the basis of his disability. *Majors v. General Electric,* 714 F.3d 527 (7th Cir. 2013). Sutton Ford does not challenge that Green is disabled within the meaning of the ADA. Rather, it argues that Green was not a "qualified individual."

### A.    Qualified Individual

Under the ADA:

> [A]n individual is qualified if he, 'with or without reasonable accommodation, can perform the essential functions of the employment

---

[4]After the [2009 ADA] Amendments took effect, an employee could be "regarded as" having a disability as long as an employer believed that employee to be impaired, whether or not that perceived impairment substantially limited a major life activity. *Steffen v. Donahoe*, 680 F.3d 738, 742 (7th Cir. 2012) (citing 42 U.S.C. § 12102).

position that such individual holds or desires.' 42 U.S.C. § 12111(8). Courts ask two questions to determine if an individual is qualified: (1) Does the person satisfy the prerequisites for the job (e.g., educational background, employment experience, skills, or licenses)? and (2) Can the individual perform the essential functions of the job with or without accommodation?

*Amsted Rail Co.*, 280 F. Supp. 3d at 1151–52 (inquiry is based on "an individualized assessment of the individual and the relevant position" at the time of the alleged discrimination).

Sutton Ford does not question Green's prerequisites for the job, but insists that Green should be judicially estopped from asserting his ADA claim based on the fact that he had applied for and was receiving SSDI benefits when he was not rehired. Memo. at 11. Sutton Ford argues that Green's receipt of SSDI is at odds with his assertion that he was able to perform the essential functions of a car sales consultant in September 2018. The Supreme Court, notes Sutton Ford, has explained that, while there are situations where a "SSDI claim and an ADA claim can comfortably exist side by side . . . an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim. Rather, [he] must proffer a sufficient explanation [of the contradiction]." *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 803, 806 (1999). Sutton Ford argues that Green fails to provide a sufficient explanation, characterizing Green's condition in September 2018 as in accord with his previous claim that he was unable to work. Indeed, says Sutton Ford, Green had to take short term disability leave in November 2017, later developed neuropathy and glaucoma, and reported little to no improvement (with a history of recorded falls) through July 2018. Memo. at 13–14. Further, Sutton Ford argues that Green fails to

12

show he disclosed to the SSA that he was seeking employment, undermining his claim that he was in fact able to perform the duties of his old job. *Id.* at 14.

Green counters that consistent with *Cleveland,* he has provided a sufficient explanation. Green maintains that his receipt of SSDI is consistent with his claim that he was able to perform the essential functions of his job in September 2018. This is because his condition improved in the two months directly preceding September 2018. R. 59, Resp. at 4. Indeed, says Green, Dr. Buchanan's note of July 13, 2018 documents the improvement Green made after switching to a new physical therapy regime at Olympia Fields. *Id.* (citing R. 60 at 21–28, PSOAF ¶¶ 2, 9–11).

The Court agrees with Green that his explanation is sufficient to survive summary judgment. True, neither Dr. Buchanan's medical notes nor deposition testimony speak to the specific type of work or number of hours that Green could work in September 2018. Nor did Dr. Buchanan's note approving Green to return to part-time light duty work in August 2018 mention Sutton Ford or Green's duties or responsibilities as a car salesman. But his medical notes, including his approval that Green return to work, indicate that Green's health had improved since Green had applied for and received SSDI. And the Court cannot conclude that clearance for part-time light duty work meant Green was medically precluded from performing the duties of his car salesman job, like walking the lot and using his demonstrator car.

Further, the SSA provides a "Trial Work Period" which allows a benefits recipient to test his ability to work for at least nine months and still receive full benefits, as long as the recipient reports their work to the SSA and remains disabled.

Def.'s Resp. PSOAF ¶ 31. Green contends that he knew this and, had he been rehired by Sutton Ford, planned to report his new job to the SSA. *Id.* ¶¶ 17, 32. The record does not establish that Green failed to abide by SSA rules or committed fraud of any kind. And while Green testified that he remained disabled through September 2018, this testimony is not fatal because, as explained, Green's use of that term for the purposes of SSDI eligibility does not necessarily mean he could not do the duties of his former job in September 2018. Pl.'s Resp. DSOF ¶ 36. Especially because the Court must view the record in the light most favorable to Green, the Court cannot find that Green was unqualified to perform the essential functions of the job based on his SSDI benefits.

Sutton Ford next argues that Sutton Ford only gave Green a "temporary" flexible schedule arrangement, and he was not entitled to get it back. Memo. at 15 (citing *Watson v. Lithonia Lighting*, 304 F.3d 749, 752 (7th Cir. 2002) (rejecting the plaintiff's argument that "if an employer [offers an accommodation], it must allow an injured employee to occupy the light-duty (or limited-task) position indefinitely[,]" because that requirement would "diminish the employer's ability to accommodate employees who have transient conditions")). Sutton Ford posits that the fact that Dr. Buchanan only approved Green for part-time light duty work shows that Green was unqualified to work his former position as a full-time sales consultant. Green, for his part, characterizes the flex-time schedule as a "permanent" change to the conditions of his job, stating that Sutton told him explicitly that the change was permanent. Resp. at 5. Indeed, says Green, he worked under those conditions for years, showing

it was not a temporary situation. He thus argues that his clearance for part-time light duty work demonstrates that he was qualified to perform the essential functions of his former job. Resp. at 6.

Viewing the facts in the light most favorable to Green and drawing reasonable inferences in his favor, the Court finds for Green on this issue. True, as Sutton Ford argues, an employer that gives an employee a temporary accommodation is not later required to create a new permanent job for that employee based upon that accommodation. Memo. at 10 (citing *Watson*, 304 F.3d at 752). But in *Watson*, the plaintiff "[could not] perform any assembly-line job at Lithonia; what she want[ed was] a different job, comprising a subset of the assembly-line tasks, rather than an accommodation in the performance of one of Lithonia's existing assembly-line jobs (all of which entail all tasks)." 304 F.3d at 752. Here, there is no evidence that Green's original schedule was an essential function of the job. Indeed, there is no evidence that Green's job ever required him to do more than light duty work, like walking around the lot, or that Green was unable to perform any of the specific duties of his position when working a flex-time schedule. Green just needed to be allowed to do his duties on a non-standard schedule. *See* Def.'s Resp. PSOAF ¶ 28 (Sutton Ford "admits Plaintiff was allowed to work part-time between 2015 and 2017"). Further, there is no evidence that Sutton Ford would have ever fired Green had his pre-November-2017 health condition persisted indefinitely. Put another way, drawing the inference in Green's favor, Green was not given one of a "pool of positions" set aside "for recovering employees," only to fail to recover to his original healthy state; rather, he

was provided a reasonable (and allegedly permanent) accommodation allowing him to perform his regular job. *Watson*, 304 F.3d at 752.

Ultimately, there is a genuine issue of material fact regarding the nature of Green's former job—whether the flex time schedule was a temporary or permanent arrangement—and whether he was qualified to return to that position. The jury must determine whether Green was qualified to perform the essential functions of his former job with or without reasonable accommodations, so summary judgment must be denied.

## B. Vacant Position

Next, Sutton Ford argues that there is no evidence that it had any vacancy for a part-time, flexible hour position like the one Green desired in September 2018. Here, Sutton Ford repeats its arguments that it is not required to create a new position patterned after the previous flex-time schedule arrangement and that Green could not perform the essential functions of the job. Memo. at 18 (citing, among other cases, *Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001) (employer "not required to reallocate essential functions" to other employee)). Sutton Ford then contends that Green cannot identify any vacant position that he was willing and able to fill in September 2018. Memo. at 19 (citing *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir. 2005) ("It is the plaintiff's burden to show that a vacant position exists for which [s]he was qualified.") (quoting *Ozlowski*)).

Green retorts that the evidence shows that his old position was available. Resp. at 6. He points to Sutton Ford's letter that it sent to Green after the September 25,

2018 meeting, which stated, "I told [Green] because he did not have a doctor's release he could work part-time calling his customer base for $10.00 per hour and 50% commission because I would have to pay another salesperson 50% of the commission since Andre was not physically able to navigate (walk) the inventory lot and perform all sales person responsibilities." Green Dep. at 113.

The Court agrees with Green that there is a genuine issue of material fact regarding whether Green's former position was vacant in September 2018. Construing the language in favor of Green, the October 31, 2018 letter from Sutton Ford implies that the part-time job was available; Sutton Ford merely claimed that Green was physically unable to do the job, and that another employee who could walk would have to split the job's commissions with him. In addition, it is undisputed that (1) in May 2018, Sutton said that Green would "always have a job here" and (2) in August 2018, Sutton told Green to visit him and bring a doctor's note to discuss Green's potential rehire. That is more evidence that Green's former position was vacant in September 2018, just four months and one month later, respectively. While Sutton Ford disagrees with Green's characterization of the October 2018 letter, *see* R. 62, Reply at 4 (arguing Sutton only offered Green a job calling customers), there is enough of a factual dispute to survive summary judgment.

## C. Discriminatory Intent

Lastly, Sutton Ford argues that Green fails to provide direct or indirect evidence that he was not rehired *because of* his alleged disability. Green can prove discriminatory intent by using the direct method or indirect, burden-shifting method.

> Under the ADA, an employee has available two methods for establishing that her employer discriminated against her based on her disability. First, the employee may present direct or circumstantial evidence that the employment decision was motivated by the employer's discriminatory animus. Second, the employee may use the burden-shifting method set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973) to prove by indirect evidence that her employer intentionally discriminated against her.

*Bekker v. Humana Health Plan, Inc.*, 229 F.3d 662, 670 (7th Cir. 2000) (internal citations and quotations omitted). In recent years, the Seventh Circuit has moved away from—while not abandoning completely—these two methods, instead instructing that, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the "direct" evidence does so, or the "indirect" evidence. Evidence is evidence." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). The ultimate question is whether there is evidence that "would permit a reasonable factfinder to conclude that the plaintiff's [disability,] race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

"If an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision. If the employer succeeds, then the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment

18

action is pretextual." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 839 (7th Cir. 2012); *see also Khowaja v. Sessions*, 893 F.3d 1010, 1014 (7th Cir. 2018) (clarifying that *Ortiz* did not alter the burden-shifting framework set forth in *McDonnell Douglas*).

Sutton Ford asserts that there is no direct evidence of its alleged discriminatory intent. Memo. at 13–14. Nor, it says, is there indirect evidence, such as a similarly situated non-disabled employee that was treated more favorably than Green. *Id.* (citing *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1129 (7th Cir. 2006) (evidence of discrimination "can consist of evidence that similarly situated nondisabled persons received more favorable treatment or some other evidence permitting an inference of discrimination")). Rather, Sutton Ford claims that Sutton was "legitimately concerned" about Green's ability to work given Green's past medical condition and the impact it had on his employment history. Memo. at 20.

Green responds that the only reason Sutton gave for not hiring Green was Green's medical condition. *See* Def.'s Resp. PSOAF ¶ 3 (Sutton refused to "chance [Green] being here any longer without [Green] having [his] kidney transplant"). Green insists that he gave Sutton a doctor's note that stated he could "return to work part time light duty on August 13, 2018." Green Dep. at 112 (note contains no walking restrictions). Despite this note, Sutton improperly regarded Green as disabled and unable to safely return to his job.

Sutton's admission that he did not rehire Green because of health concerns, coupled with Green's testimony that Sutton read Dr. Buchanan's July 13, 2018 note approving Green for part-time work, is enough evidence to warrant denial of

19

summary judgment on Green's "regarded as" disabled claim. While it may be true that Sutton was subjectively concerned about Green's health, Green disputes that and provides the doctor's note clearing him for work. In addition, while Green does not identify a specific employee that was treated more favorably than him, Sutton Ford admits that other employees took medical leave and returned to their former jobs without still being regarded as too ill to work. Memo. at 21 ("Mr. Sutton testified that 'everyone else took FMLA leave without pay and just came back after their illness.'"). Because a reasonable jury could find that Sutton Ford thus discriminated against Green by not rehiring him after his illness, the Court cannot grant summary judgment for Sutton Ford.

## II.     FMLA Claim

In Count II, Green alleges that Sutton Ford violated the FMLA when it "refused to hire [him] in retaliation for [Green] previously requesting leave under the FMLA." Complaint ¶ 31.

The FMLA allows eligible employees to take unpaid leave to tend to a serious health condition" and "prohibits employers from discriminating against employees who have taken FMLA leave." *Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 349 (7th Cir. 2009) (citing 29 U.S.C. §§ 2612, 2615). To prevail on a retaliation claim under the FMLA, Green must demonstrate that: (1) he engaged in a protected activity; (2) Sutton Ford "took adverse action" against her; and (3) "the protected activity caused the adverse action." *Freelain v. Village of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018). The Court considers "the evidence as a whole" and asks "whether a

20

reasonable jury could draw an inference of retaliation." *King v. Ford Motor Co.*, 872 F.3d 833, 842 (7th Cir. 2017).[5]

To survive summary judgment on his FLMA claim, Green must "point to evidence supporting a reasonable inference that [he] was fired because [he] took protected leave." *Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 505 (7th Cir. 2017). Such evidence "may include suspicious timing, ambiguous statements from which a retaliatory intent can be drawn, evidence of similar employees being treated differently, or evidence that the employer offered a pretextual reason for the termination." *Jajeh v. Cnty. of Cook,* 678 F.3d 560, 570 (7th Cir. 2012); *see also Tibbs*, 860 F.3d at 505–06; *Kemp v. Cnty. of Cook*, 2016 WL 6524945, at *3 (N.D. Ill. Nov. 3, 2016).

Here, Sutton Ford concedes that Green engaged in protected activity by asking for FMLA leave in 2015. Reply at 8. It argues instead that Green fails to create a causal connection between his request for FMLA and Sutton Ford's failure to rehire him. Sutton Ford contends that Green provides no evidence of retaliation, as his own testimony established that he was unqualified for a full-time position and no other employees were treated more favorably than him. Green counters that his FMLA claim survives because Green requested FMLA leave due to his kidney issues, and

---

[5]Although the parties frame their arguments using direct and indirect methods of proof, the Seventh Circuit has expanded its guidance that courts should not rigidly apply that framework to include not only employment discrimination claims, but also FMLA retaliation claims. *See Freelain*, 888 F.3d at 905 ("We repeat our caution that courts should not discard circumstantial evidence simply because it does not provide direct proof of unlawful intent.") (citing *Ortiz*, 834 F.3d at 765); *see also Jordan v. Marsh USA, Inc.*, 2019 WL 5682834, at *6 & n.8 (N.D. Ill. Nov. 1, 2019). Therefore, the Court considers the evidence in a manner consistent with *Ortiz*.

Sutton told Green that he could not hire Green "without you having your kidney transplant." Resp. at 9 (citing PSOAF ¶ 3). Green points out that Sutton Ford offers no authority in support of its argument that there is insufficient evidence to establish a causal connection between Green's request for FMLA leave and Sutton Ford's failure to hire him. Resp. at 10. However, Green also fails to cite to any cases in support of his argument that he has produced sufficient evidence. *See id.*

The Court agrees with Sutton Ford that Green fails to establish a causal connection between his request for FMLA leave and Sutton Ford's failure to hire him. *See Jajeh,* 678 F.3d at 570 (evidence of retaliation can include ambiguous statements, suspicious timing, similar employees, or pretextual reasons). There is no direct admission of retaliation from Sutton, and Green fails to cite any ambiguous statements from Sutton that display a retaliatory intent based upon FMLA leave. The timing of Sutton's refusal to rehire Green undermines any alleged causal connection with Green's FMLA request, as the refusal to rehire occurred years after Green requested leave. Green also fails to identify any similar employee. *See Hull v. Stoughton Trailers, LLC.,* 445 F.3d 949, 952 (7th Cir. 2006) ( "[W]ithout meaningful comparison data, there simply is not enough circumstantial evidence from which a reasonable jury could conclude that [the defendant] fired [the plaintiff] because he took FMLA leave, rather than because of a myriad of other permissible (even if distasteful) reasons, which run the gamut from personal animus to sheer employer whim."). And the fact that Sutton Ford admits that other employees took FMLA leave and were allowed to return to their jobs—a fact which helped Green in the ADA

context—cuts against Green in the FMLA context, because it shows that other Sutton Ford employees engaged in the same protected activity as Green and were not punished for it. Lastly, retaliatory intent is belied by the fact that for years after Green requested FMLA leave, Sutton Ford accommodated Green with flexible hours and allowed him to take short term disability without firing him. *See Plaxico v. Cnty. of Cook*, 2011 WL 4837287, at *8 (N.D. Ill. Oct. 12, 2011) (employee "had been utilizing FMLA leave for almost two years . . . [and] does not offer any evidence as to why Defendants did not demote him during that period of time, if in fact his demotions were motivated by his FMLA leave."). Because Green does not provide sufficient evidence that would allow a reasonable jury to draw an inference of retaliatory intent, his prima facie case under the FMLA fails. *See Kinsella v. Am. Airlines, Inc.*, 685 F. Supp. 2d 891, 901–02 (N.D. Ill. 2010).

## III. Promissory Estoppel Claim

Green asserts in Count III a promissory estoppel claim based on his contention that he resigned his position at Sutton Ford in reliance on Sutton's statement that he would "always have a job here when your doctor clears you." Complaint ¶¶ 36–37; *see id.* ¶ 14 ("Take as much time as you need to address these medical issues without making a formal FMLA request to do so. Don't worry your job is here."). Green argues that this was an unequivocal promise that Sutton Ford would hire Green back for his position when his doctor cleared him, and that he relied on that promise to his detriment by resigning. *Id.*; *see id.* ¶ 39 (alleging he "never would have resigned had Mr. Sutton not made that express and unequivocal promise").

To recover for promissory estoppel, Green must prove that: (1) [Sutton Ford] made an unambiguous promise to [him]; (2) [he] relied on such promise; (3) [his] reliance was expected and foreseeable by [Sutton Ford]; and (4) [he] relied on the promise to [his] detriment." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 566 (7th Cir. 2012)). The doctrine of promissory estoppel promotes "the same purpose as the tort of misrepresentation: punishing or deterring those who mislead others to their detriment and compensating those who are mislead." *Id.* "If an alleged promise is so indefinite as to be unenforceable, then the doctrine of promissory estoppel . . . is inapplicable as a matter of law." *Irish v. Cont'l Cas. Co.*, 2021 WL 4962665, *3 (N.D. Ill. Apr. 8, 2021) (internal quotation and citation omitted).

Sutton Ford first argues that Green fails to sufficiently allege that Sutton's promises were "unambiguous offers of permanent employment." Memo. at 23 (citing *Robinson v. BDO Seidman, LLP*, 854 N.E.2d 767, 770 (Ill. App. Ct. 2006) ("In order to overcome the assumption that an employment is at will, the terms of an oral contract for employment for a specific duration must be clear and definite.")). Rather, Sutton Ford characterizes the statements as mere "informal expressions of goodwill and hope[.]" *Robinson*, 854 N.E.2d at 771 (finding representation was not sufficiently clear and definite to overcome the presumption that the plaintiff's employment was at will, because "plaintiff does not allege that it was mentioned again in a subsequent interview or when plaintiff was presented with his employment package"). Sutton Ford argues that in this case, as in *Robinson,* there was no specific representation establishing a duration on Green's employment. *Id.*; *see Kercher v. Forms Corp. of*

*Am.*, 630 N.E.2d 978, 980 (Ill. App. Ct. 1994) (finding "no clear and definite expressions for permanent employment" despite that "Defendant did comment about plaintiff being groomed to become the president and defendant did respond that plaintiff's job was a long-term proposition. However, optimistic expressions about the future and statements which are informal in character and express only 'long continuing good will and hope for eternal association' are insufficient to establish an oral contract for permanent employment.").

Green counters that the statements are unambiguous promises. Green argues that the promise was not a guarantee of a "lifetime job," as characterized by Sutton Ford, which might reasonably be construed as a mere informal expression of goodwill and hope. Resp. at 11. Rather—in context—Sutton's statements were clear expressions of a promise to *rehire* Green when his doctor cleared him as able to perform his old job. *Id.* (noting that Sutton's promises that Green's "job is here" and he would "always have a job when your doctor clears you" did not also include the words "*and you can work in your job forever*"). Green submits that *Robinson* is distinguishable as that case involved an alleged offer of permanent employment, because the plaintiff there claimed that the "defendant breached its agreements to employ plaintiff until the new department was successfully established and thereafter for as long as plaintiff desired[.]" *Robinson*, 854 N.E.2d at 773.

The Court agrees with Green that the promise here, construed in the light most favorable to Green, was not an offer of permanent employment or so indefinite as to warrant summary judgment in favor of Sutton Ford. Green had specifically engaged

25

Sutton about how to take distributions on his 401(k), and had been advised that he must resign to do so. In that context, Sutton's alleged statements that Green would always have a job when his doctor cleared him constituted an unambiguous promise that he would be *rehired*, as opposed to a guarantee that he would always and forever be employed at Sutton Ford. And, construed in Green's favor, the promise contemplated a specific date, sometime in the future, when a doctor would sign off on Green returning to work. Like Green, the Court finds *Robinson* distinguishable.

*Robinson*, unlike this case, did not involve an alleged offer to rehire. There, the plaintiff was allegedly terminated without cause. The issue was whether the employer in that case had made a valid oral contract of permanent employment when it hired the plaintiff. *Robinson*, 854 N.E.2d at 769 (employer "told plaintiff that if he accepted the position as head of defendant's new department, 'he would be employed as long as it takes to successfully build the department, and then as long as plaintiff desired'"). The plaintiff was subsequently terminated and filed suit for breach of contract and promissory estoppel. The court found the promise insufficiently clear and definite. Here, unlike *Robinson*, the promise was clear and definite that Green would be rehired if his doctor approved him to return to work.

Sutton Ford also argues that Green's promissory estoppel claim is barred by the statute of frauds. Memo. at 25. "The Illinois statute of frauds provides, '[n]o action shall be brought . . . upon any agreement that is not to be performed within the space of one year from the making thereof, unless [it is] in writing and signed by the party to be charged.'" *Robinson*, 854 N.E.2d at 772 (citing 740 ILCS 80/1 (West 2004)). "Put

another way, the statute of frauds prohibits oral contracts that cannot be performed within one year of their making." *Id.* Sutton Ford again characterizes Sutton's statements as promises of permanent employment, but as the Court explained, the promises are reasonably construed as promising Green's rehiring upon clearance by a doctor. Because such a contract was performable within a year of its making, had a doctor cleared Green to work his former job within that time period, the claim is not barred by the statute of frauds.

## Conclusion

For the foregoing reasons, Sutton Ford's motion for summary judgment is granted as to Green's FMLA claim and denied as to his ADA and promissory estoppel claims. By January 4, 2023, the parties are directed to file a status report indicating: (1) whether the parties would like a referral to the Magistrate Judge for a settlement conference; (2) whether the parties consent to proceeding with trial before the Magistrate Judge, (3) whether the parties consent to a bench trial, (4) the anticipated number of days for trial (accounting for voir dire), (5) the expected number of witnesses; and (6) if the parties do not consent to proceeding before the Magistrate Judge, their availability for trial.

Dated: December 14, 2022

United States District Judge
Franklin U. Valderrama

27